COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RED SEA GAMING, INC., A Nevada Corporation, and RED SEA NEVADA, INC., Nevada Corporation, | § § § | No. 08-07-00288-CV |
| Appellants, | § | Appeal from |
| | § | 68th District Court |
| v. | § | of Dallas County, Texas |
| BLOCK INVESTMENTS (NEVADA) COMPANY, a Nevada Corporation, BLOCK 1991 INVESTMENT TRUST, and MICHAEL A. BLOCK, | § § | (TC # 04-09410) |
| | § | |
| Appellees. | § | |
| | § | |

## **O P I N I O N**

This appeal arises from a dispute between limited partners over the sale of a partnership interest in a Las Vegas hotel and casino. Red Sea Gaming Inc. and Red Sea Nevada, Inc. ("Red Sea") complain of an insufficient damage award. Block Investments (Nevada) Company, Block 1991 Investment Trust, and Michael A. Block ("Block") raise a cross-point challenging the denial of their motion for judgment n.o.v. on liability. We overrule Block's cross-point, sustain Red Sea's complaint as to damages, and remand for trial.

### **FACTUAL BACKGROUND**

Red Sea and Block formed the Bourbon Street Casino and Hotel Limited Partnership to own and operate the Bourbon Street Casino and Hotel in Las Vegas, Nevada. Block testified that Bourbon Street's operations were unprofitable and required regular capital contributions by the partners to fund operations and service bank debt of $11.5 million. Both parties agree that early in the partnership, there were discussions about developing the property with third parties, and that

several potential investors showed an interest.

In 2003, Trevor Pearlman[1] and Reagan Silber began discussions with Block about acquiring an interest in Bourbon Street. Under the terms of a partnership pre-formation agreement, Pearlman would pay $13.75 million for a 50% interest in the new partnership. Sixteen days later, Block began negotiating to purchase Red Sea's interest. In anticipation of a deal with Pearlman and Silber, Block agreed to buy Red Sea's interest for $11.25 million. This agreement called for earnest money of $100,000, which Block paid. Red Sea was unaware that Block was simultaneously negotiating an agreement to sell Red Sea's interest to Pearlman and Silber for $13.75 million.

In the course of structuring an agreement with Pearlman and Silber, Block formed TRB Nevada, Ltd., a partnership that was to own and operate the Bourbon Street. In July 2003, Block also formed BP Albert, L.L.P., a partnership intended to be used as a vehicle to purchase land adjacent to the casino-hotel in the event a deal was reached with Pearlman and Silber. Before closing, Silber changed his mind and the agreement fell through. As a result, Block was unable to complete his purchase of Red Sea's interest and he forfeited the $100,000 earnest money. Between May and November 2003, not only did Block fail to disclose the prospect of selling partnership interests, it affirmatively advised Red Sea that it knew of no such opportunity. In November 2003, Block and Pearlman reached a new agreement. They executed a contract by which Pearlman would invest $12.5 million in TRB and Block would contribute the casino-hotel to TRB. As a result, TRB would own Bourbon Street while Block and Pearlman would each own one-half of TRB. The deal contemplated that $11.5 million of Pearlman's $12.5 million would pay Bourbon Street's bank debt, leaving TRB with $1 million in operating capital. Also in November and early December, Block --through BP Albert L.L.C.--began contracting to buy parcels of land contiguous to the Bourbon

---

[1]       Trevor Pearlman's last name is often seen in the record as Perlman.

Street property to improve the development site. This information was not disclosed to Red Sea.

On December 11, 2003 Block signed a contract with Red Sea to buy its interest in Bourbon Street for $1.5 million cash, a note for $3.5 million, and Block's assumption of Red Sea's liability on the bank debt ($5.75 million), for a total of $10.75 million. The parties also signed an indemnity agreement by which Block agreed to indemnify Red Sea for damages sustained by Block's conduct in the transaction "which is adjudged to be negligent, in bad faith or pursuant to willful misconduct." Subsequent to closing, the purchase price was discounted $200,000 and Red Sea received $10.55 million for its 50% ownership interest. Simultaneously, Block transferred the property to TRB. This transaction consummated the arrangement whereby Block and Pearlman each owned 50% of TRB. In essence, Block bought Red Sea's interest for $10.55 million and then turned around and sold it to Pearlman for $12.5 million the very same day. In March 2004, Block sold his 50% interest to Silber for $14 million.

Red Sea sued Block for breach of duty to the partnership. In an effort to shift defense costs to Block, Red Sea filed a motion for summary judgment on the enforceability of the indemnity agreement. The trial court deferred a ruling and the lawsuit proceeded to trial. A jury found in favor of Red Sea and awarded $400,000 in damages. The trial court denied Red Sea's post-trial motion for declaratory judgment on the indemnity agreement and Block's motion for judgment notwithstanding the verdict with regard to the jury's finding of liability. This appeal follows. In two issues for review, Red Sea complains that the damage award is insufficient and that the trial court erred in refusing to enforce the indemnity agreement. Block raises a single cross-point. We address this issue first, because a finding in favor of Block would render Red Sea's damages complaint moot.

## BLOCK'S CROSS-POINT ON APPEAL

Block challenges the denial of its motion for judgment n.o.v. on liability. It argues the evidence is legally insufficient because Block did not owe a fiduciary duty to Red Sea nor did Block's buy-out of Red Sea comprise partnership business implicating the statutory duties of loyalty and care.

*Waiver of Form Complaints*

Red Sea argues that Block is really attacking a jury instruction to which it did not object. Indeed, Block expressly disclaimed form and factual sufficiency arguments. Block concedes as much, but maintains it has not waived its legal sufficiency complaint. In support of its argument, Block directs us to *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711 (Tex. 2001). There, the jury found that Wal-Mart had tortiously interfered with the plaintiff's prospective agreement to lease real property. Based on that answer, the trial court awarded actual and punitive damages. *Id*. at 719. On appeal, Wal-Mart claimed there was no evidence to support the jury's finding that it wrongfully interfered with the plaintiff's prospective lease or that it was not justified in acting as it did. *Id*. The company had not objected to the jury charge. *Id*. at 715. The Supreme Court construed Wal-Mart's legal sufficiency challenge as raising the question of "what kind of conduct is legally harmful and constitutes tortious interference." *Id*. The court relied on *City of Fort Worth v. Zimlich*[2] for the proposition that when a party fails to object to a jury instruction, evidence to support a finding based on the instruction should be assessed "in light of" the instruction given. *See also, Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985). Block contends that its argument is essentially the same and we agree.

*Standard of Review*

In conducting a *Wal-Mart* analysis, we apply the traditional legal sufficiency or "no

---

[2] 29 S.W.3d 62, 71 (Tex. 2000).

evidence" standard. When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). A legal sufficiency or "no evidence" challenge will be sustained on appeal if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Carrasco v. Stewart,* 224 S.W.3d 363, 367 (Tex.App.--El Paso 2006, no pet.), *citing City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005). We view the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence if a reasonable juror could not. *City of Keller,* 168 S.W.3d at 807. We also indulge every reasonable inference that would support it. *Id.* at 822. But if the evidence allows only one inference, the trier of fact may not disregard it. *Id.* When a no-evidence point of error rests on the competency of the evidence, we may not disregard contrary evidence showing it to be incompetent. *Id.* at 812.

*Jury Question 1*

Block complains that the trial court actually instructed the jury on fiduciary duty, not on the partnership duties of loyalty and care. Here is the relevant portion of the charge:

Because the parties were partners, Block owed Red Sea duties of loyalty and care. To prove that Block complied with those duties, Block must show:

a. The purchase of Red Sea's partnership interest in the Bourbon Street Casino and Hotel Limited Partnership on January 22, 2004 was fair and equitable to Red Sea;

b. Block made reasonable use of the confidence that Red Sea placed in Block;

c. Block acted in the utmost good faith and exercised the most scrupulous honesty toward Red Sea;

d. Block did not use the advantage of Block's position to gain any benefit for Block at the expense of Red Sea, and did not place Block in any position where Block's self-interest might conflict with Block's obligations as partners (you are instructed that a partner does not violate a duty or obligation merely because the partner's conduct furthers the partner's own interests); and

e. Block fully and fairly disclosed all important information to Red Sea concerning the purchase of Red Sea's partnership interest in the Bourbon Street Casino and Hotel Limited Partnership on January 22, 2004.

**Question 1**

Did Block comply with Block's duties of loyalty and care to Red Sea?

The jury answered "no" as to both Michael Block and Block Investments (Nevada) Company.

*Texas Revised Partnership Act*

Block emphasizes that Jury Question One did not define loyalty and care in accordance with

the Texas Revised Partnership Act. Article 6132b-4.04 provides:

(a) **Duties**. A partner owes to the partnership, the other partners, and transferees of deceased partners designated in Section 5.04(b):

(1) a duty of loyalty; and

(2) a duty of care.

(b) **Loyalty**. A partner's duty of loyalty includes:

(1) accounting to the partnership and holding for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or from use by the partner of partnership property;

(2) refraining from dealing with the partnership on behalf of a party having an interest adverse to the partnership; and

(3) refraining from competing with the partnership or dealing with the partnership in a manner adverse to the partnership.

(c) **Care**. A partner's duty of care to the partnership and the other partners is to act in the conduct and winding up of the partnership business with the care an ordinarily prudent person would exercise in similar circumstances. An error in judgment does not by itself constitute a breach of this duty of care. A partner is presumed to satisfy this duty if the partner acts on an informed basis and in compliance with Subsection (d).

TEX.REV.CIV.STAT.ANN. art. 6132b-4.04 (Vernon Supp. 2009). The State Bar Committee commentary following Section 4.04 recites the following:

Unlike the title of TUPA § 21, but like its test, Section 4.04 does not use the term 'fiduciary.' This section defines partner duties and implies that they are not to be expanded by loose use of 'fiduciary' concepts from other contexts or by the rhetoric of some prior cases. Similarly, subsection (f) specifically states that a partner as such is not a trustee and is not held to the same standards as a trustee, thus further attempting to restrict reliance on the unfortunate language of prior law. The term 'fiduciary' is inappropriate when used to describe the duties of a partner because a partner, unlike a true trustee, may legitimately pursue the partner's own self interest and not solely the interest of fellow partners or the partnerships.

TEX.REV.CIV.STAT.ANN. art. 6132b-4.04 cmt.

*Analysis*

The term "fiduciary duty" does not appear in the instruction or in the question. We agree with Red Sea that the jury question was properly modified to recite the standard for duties of loyalty and care. There are two important distinctions: (1) the language requiring a fiduciary to subordinate his own self-interest is omitted from Question 1; and (2) Question 1 contains an express instruction that "a partner does not violate a duty or obligation merely because the partner's conduct furthers the partner's own interests." While the charge does not define the duty of loyalty and care in precisely the same terminology as the statute, the statutory language is non-exclusive rather than exclusive. Section 4.04 states that the duty of loyalty "includes the following." The Texas Uniform

Partnership Act stated that the duty of loyalty "is limited to the following." TEX.REV.CIV.STAT. ANN. art. 6132b - 4.04. We reject Block's premise that the jury was actually instructed on fiduciary duty rather than the duties of loyalty and care.

*Legal Sufficiency*

Our analysis continues with whether there was legally sufficient evidence to support the jury's finding that Block breached a duty owed to Red Sea in light of the jury instruction given. *Wal-Mart Stores, Inc.*, 52 S.W.3d at 715. During trial, evidence was presented that the following acts occurred prior to Block's purchase agreement with Red Sea:

- Block contacted Trevor Pealman, an individual willing to purchase half of the partnership at a premium. Rather than disclose this potential buyer to Red Sea, Block concealed the inquiry from its partner and began negotiating the sale of Red Sea's interest without notice to or consent of Red Sea.

- Block failed to disclose the formation of BP Albert. L.L.C., a competing entity created by Trevor Pearlman and Block to acquire property adjacent to the hotel in order to increase the development value of the site.

- Block failed to disclose to Red Sea that BP Albert actually executed contracts to buy the surrounding properties prior to Red Sea's agreement to sell its interest to Block.

- Block failed to disclose to Red Sea its efforts to remove an easement which had previously prevented effective development of the property by the partnership.

- Block failed to disclose to Red Sea its negotiations with Trevor Pearlman or the execution of the pre-formation agreement for the sale of Red Sea's partnership interest in June of 2003, several months before Red Sea agreed to sell its interest to Block.

- Block failed to disclose to Red Sea its negotiations with Trevor Pearlman and Reagan Silber in the summer of 2003 to sell the entire property, the sole asset of the partnership.

• Block failed to disclose to Red Sea its agreement to sell one-half of the partnership to Trevor Pearlman, which it executed 16 days before Red Sea agreed to sell its interest to Block.

We conclude that this evidence is legally sufficient in light of the instruction given. *Wal-Mart*, 52 S.W.3d at 715.

*Partnership Business*

Finally, Block argues that because the buy-out of one partner by another is not "partnership business," it did not owe either a duty of loyalty or care. It does not direct us to any authority supporting this assertion. Regardless, in light of the evidence presented at trial, the jury could have found that Block breached its duties *before* it bought Red Sea's interest. Particularly *apropos* is the evidence that Block failed to disclose its efforts to remove an easement which had previously prevented effective development of the property by the partnership and that it had formed a competing entity to acquire property adjacent to the hotel to increase the development value of the site. We overrule Block's cross-point on appeal.

**JURY AWARD**

Red Sea argues in its first issue for review that the trial court erred in failing to set aside the jury's verdict. Specifically, Red Sea argues that it presented three uncontroverted damage models to the jury, while Block presented a zero-damages theory which did not relate to the jury question. Because the jury was not faced with believing one valuation witness over another, nor was the evidence such that the jury could determine an award within a range of damages, Red Sea contends this case involves a jury award that is totally devoid of support in the record.

*Standard of Review*

We review complaints of improper or inadequate damage awards for sufficiency of the evidence. *See Larson v. Cactus Utility Co.*, 730 S.W.2d 640, 641 (Tex. 1987). Here, Red Sea

argues that the evidence is factually insufficient to support the jury's damages award. In reviewing the factual sufficiency of the evidence, we consider all of the evidence in the record. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996). If a party is attacking the factual sufficiency of an issue upon which it had the burden of proof, it must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex. 1983); *Marrs and Smith Partnership v. D.K. Boyd Oil and Gas Co., Inc.,* 223 S.W.3d 1, 14 (Tex.App.--El Paso 2005, pet. denied). In reviewing a factual sufficiency issue, we must first examine the record to determine if there is some evidence to support the finding; if so, then we must determine whether the failure to find is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986).

*Jury Question 5*

Jury Question 5 and the accompanying instruction stated:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Red Sea for their damages, if any, that were caused by such conduct?

In answering this question, you may consider only the difference, if any, between the value of what Red Sea received in the sale of Red Sea's partnership interest in the Bourbon Street Casino and Hotel Limited Partnership on January 22, 2004, and the value given to Block in exchange.

The jury awarded Red Sea $400,000 in damages for Block's tortious acts.

A jury must have an evidentiary basis for its findings. *Salinas v. Rafati*, 948 S.W.2d 286, 289 (Tex. 1997)(plaintiffs failed to establish a casual link between specific dollar amounts for medical expenses and the specific acts of negligence that occurred during the baby's delivery); *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 839-41 (Tex. 1997)(reversing jury finding of value of partnership interest that differed from values proffered by expert witnesses). It

is unreasonable for a jury to disregard the evidence presented and arbitrarily determine a damage award.  *Sage Street Associates v. Northdale Const. Co.*, 956 S.W.2d 583 (Tex.App.--Houston [14th Dist.] 1997, pet. denied).

*Block's Damage Model*

Block offered the testimony of James Smith to establish that Red Sea suffered no damages at all.  The purpose of his testimony was to review the January 22, 2004 transactions and form an opinion as to the economic ramifications of those transactions.  Smith reviewed copies of the title company closing statements; the amounts of money exchanged in the transaction; the underlying financial information that supported the amounts of the transaction; partnership agreements; and various other documents.  He testified that there were three separate transactions involving four different groups:  (1) Red Sea; (2) Block; (3) a bank; and (4) Pearlman.

When asked about the economic effect on Block and Red Sea when Pearlman contributed $12.5 million to TRB and the title company paid off the $11.5 million bank debt, Smith responded that the gross value of Bourbon Street was not affected, but the amount of equity was changed because each party was relieved of $5.75 million in debt.  Smith testified that there was no evidence in the transactions that the Block Group walked away from the transaction with any cash.

As to Red Sea's interest, Smith testified that by the time the title company had completed all the transactions, Red Sea had cash and a note from Block totaling $5 million and it had been relieved of $5.75 million in principal bank debt.  Block still owned half of the casino-hotel, but he had incurred closing costs and commissions.

Red Sea contends that Smith's testimony is irrelevant to Question 5, which instructed the jury to consider only the difference between the *value* of what Red Sea received in the sale of its partnership interest and the *value* given to Block in exchange.  But Smith was not designated to

testify as to the value of the property sold to Block:

> Q. [Red Sea's Counsel] Sure. The mere fact that another partnership had been set up or another entity had been set up by Mr. Block and he had contracted to buy land around the hotel prior to the time that he approached his partner with an offer, that could have effected the value of the assets that he was seeking to acquire?

> [Block's Counsel] Excuse me, Your Honor, he's asking about value. The witness has not been designated to testify about value. He's asked to testify about the economic effect of the closing on January 22.

While Smith testified that Red Sea received $10.55 million, but he did not offer a value for what Block received in exchange. Nor does Smith's testimony support the damage award of $400,000. In its appellate brief, Block articulates a calculation that the jury could have used to reach its $400,000 award,[3] but Smith's testimony does not support that calculation. Block's damage model is insufficient to support the jury's award of $400,000. We must next look to the evidence presented by Red Sea to determine if the $400,000 finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d 176.

### Red Sea's Damage Models

Red Sea relied on the testimony of Avner Papachado,[4] part of the Papachado family who owns Red Sea, to present three different methodologies by which the jury could assess damages. The first calculated the difference between the price at which Red Sea sold its interest to Block [$10.55 million] and the price at which Block sold Red Sea's interest to Pearlman that same day [$12.5 million]. This model calculated damages at $1,950,000.[5]

---

[3]

| | |
|---|---|
| $12.5 million | [Pearlman buy-in to TRB] |
| [11.5 million] | [Bank debt paid off] |
| $ 1.0 million | [Proceeds from buy-in] |
| [ .6 million] | [Transaction expenses] |
| $ .4 million | [Net benefit to Block] |

[4]    His last name is often seen in the record as Papouchado.

[5]    Red Sea argues that Pearlman agreed to a purchase price of $12.5 million before Red Sea agreed to sell. Thus, Papachado's testimony on this model is not merely supported by an unaccepted offer, but on the actual purchase price.

The second method allowed the jury to consider the difference between the sales price to Block [$10.55 million] and the value of Red Sea's 50% partnership interest. Papachado testified that the value of Red Sea's interest was $14 million, in light of (1) the formation of BP Albert and the acquisition of contiguous properties; (2) unaccepted offers to purchase the property; (3) Papachado's personal knowledge of the Las Vegas real estate market; and (4) the price at which Block sold his 50% interest to Silber [$14 million]. This method assessed damages at $3,450,000.

Finally, the jury also heard evidence of the amount of money Red Sea would have received had it participated in the Pearlman/Silber transaction under the terms of the limited partnership agreement between Red Sea and Block. Red Sea sold its 50% interest for $10.55 million and Block immediately sold it for $12.5 million. Block then sold its 50% interest for $14 million. The sale of the entire partnership thus netted $26,500,000. Of this sum, $11.5 million in debt would have been paid, leaving net proceeds of $15 million, which would have been divided pursuant to the partnership agreement. That agreement provides for the partners' recovery of their respective initial capital contributions, $3 million having been contributed by Red Sea and $1 million by Block, after which the remainder would be divided equally. This disproportionate allocation divides the $15 million with $8.5 million attributable to Red Sea and $6.5 million attributable to Block. Subtracting the $4.8 million in cash[6] that Block paid to Red Sea leaves a shortage of $3.7 million. All of these models calculate damages significantly in excess of the jury's finding.

Block presents two arguments disputing Papachado's testimony. First, it argues that Papachado should not have been allowed to give opinion testimony because he was not properly designated as an expert witness. Second, it contends that Papachado's opinion is unreliable.

---

[6] We reiterate that Red Sea received cash in the amount of $1.5 million, later discounted by $200,000, plus a note for $3.5 million.

A property owner is qualified to testify to the market value of his property. *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996). The testimony must indicate that the owner's assessment is based on the market and not on the intrinsic value of the property to him. *Jabri v. Alsayyed*, 145 S.W.3d 660, 667 (Tex.App.--Houston [14th Dist.] 2004, no pet.). Most recently, the 14th Court of Appeals concluded that the property owner rule applies to corporate entities owning property and that a representative of the corporate owner who is familiar with the market value of the property in question may testify under this rule as to the market value of the property, without being designated as an expert witness. *Speedy Stop Food Stores, Ltd. v. Reid Road Municipal Utility District No. 2.,* 282 S.W.3d 652, 659 (Tex.App.--Houston [14th Dist.] 2009, pet. filed). That court has also held that the sole shareholder and president of a closely held corporation can testify as to the value of property of a corporation. *Bower v. Processor and Chemical Service, Inc.*, 672 S.W.2d 30, 32 (Tex.App.--Houston [14th Dist.] 1984, no writ). *See also, Maxey v. Texas Commerce Bank of Lubbock*, 571 S.W.2d 39, 46 (Tex.Civ.App.--Amarillo 1978, writ ref'd n.r.e.).

In *Collins v. Collins*, the husband attempted to give a lay opinion about the value of his corporation for purposes of the division of community property.[7] Mr. Collins was asked at his deposition whether he planned to provide any evidence regarding value, either personal opinion or expert opinion. He answered, "No." *Id*. at 800. His attorney stipulated that he would notify Mrs. Collins' attorney if any changes arose. *Id*. The court ultimately held that the trial court abused its discretion by allowing Mr. Collins to testify. *Id*. at 802. The court relied on Rule 166b(6)(a)(2), which requires a party to supplement its responses at least thirty days before trial. When an expert changes his opinion about a material issue after being deposed, Rule 166b(6)(b) requires the party to supplement discovery. *Id.* at 801; *citing Aluminum Co. of America v. Bullock*, 870 S.W.2d 2, 3

---

[7]    904 S.W.2d 792 (Tex.App.--Houston [1st Dist.] 1995, writ denied).

(Tex. 1994). The dissent argued that there was no duty to supplement and that the appropriate remedy was to cross-examine and impeach Mr. Collins. *Collins*, 904 S.W.2d 807.

Here, Papachado testified as a lay witness, not as an expert. His testimony was rationally based upon his perception of the partnership's market value and was helpful to a determination of a fact issue. *See* TEX.R.EVID. 701. We thus disagree with Block's reliance upon *Collins*, in which the court focused on expert opinion testimony. Papachado was not required to be designated as an expert in order to give lay opinion testimony of value. We find no error in the admission of his opinions.

As for reliability, Block argues that Papachado's assumptions were contrary to the facts of the case and do not form the basis for a verdict. We disagree. The standard for lay opinion testimony is laid out in Rule 701 of the Texas Rules of Evidence. The testimony must be rationally based on the perception of the witness and helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue. TEX.R.EVID. 701. Here, Papachado's testimony was based on (1) the formation of BP Albert, L.L.C., the undisclosed entity founded by Pearlman and Block; (2) unaccepted offers to purchase the partnership and the property; (3) his personal knowledge of the Las Vegas real estate market; and (4) the price at which the sale of the partnership interests actually occurred. This is a sufficient basis for his testimony.

Red Sea presented three methodologies of calculating damages. Because the damage award should have tracked one of the damage models, the jury's finding of $400,000 was against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. We sustain Red Sea's Issue One.

## INDEMNITY AGREEMENT

On December 11, 2003, Red Sea signed an Indemnity Agreement with Block. Paragraph 1

of the Indemnity Agreement provides in relevant part:

> [E]ach member of the Block Group, jointly and severally, agrees to be solely financially responsible for, and shall defend, indemnify and hold harmless each member of the Red Sea Group, Associates of the Red Sea Group and their respective officers, shareholders, representatives, controlling persons, and affiliates (collectively, the 'Indemnified Persons') from, and will pay to the Indemnified Persons the amount of, any loss, liability, cost, claim, damage of every kind or nature (including, without limitation, incidental and consequential damages), expense (including, without limitation, costs of investigation, defense and settlement and reasonable attorney's fees and expenses), fine, debt, penalty, deficiency, cause of action, proceeding, obligation or diminution of value, whether or not involving a third-party claim (collectively, 'Damages') arising, directly or indirectly, out of, from or in connection with . . . (ii) any conduct by the Block Group prior to or after the Effective Date which is adjudged to be negligent, in bad faith or pursuant to willful misconduct . . . .

During the dispositive motion stage of the case, Red Sea moved for summary judgment on the indemnity agreement, but the trial court withheld ruling on the motion at that time. Red Sea moved for declaratory judgment post-trial.

In Issue Two, Red Sea argues that the trial court erred in refusing to enforce the indemnity agreement. Block argues that Red Sea is not entitled to contract damages because they waived their claim by failing to request jury findings on the predicate liability facts (negligence, bad faith, willful misconduct). Red Sea counters that since the jury found that Block failed to comply with its duties of loyalty and care, the trial court should have adjudicated the indemnity issue in favor of Red Sea at the time of its post-trial motion.

Because a remand as to damages necessitates a retrial on liability, it is unnecessary for us to address this issue. Having denied Block's cross-issue on liability and sustained Red Sea's issue as to damages, we reverse and remand for a new trial.

January 13, 2010

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.